UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

THE STATE OF NEW YORK,

                 Plaintiff,

    -against-

FREEPORT MCMORAN, INC. d/b/a PHELPS
DODGE REFINING CORPORATION, PDRC
LAUREL HILL 9 LLC and SAGRES
PARTNERS, LLC.

                 Defendants.
_____

**COMPLAINT**

**CIV NO. 1:16-cv-0131**

## COMPLAINT

The State of New York (the "State"), by its attorney, Eric T. Schneiderman, Attorney General of the State of New York, alleges as follows:

### NATURE OF THE ACTION

1. This civil action is brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), as amended, and New York common law to recover costs that have been and will be incurred by the State in responding to the release and threatened release of hazardous substances at or from the Phelps Dodge (Laurel Hill) Inactive Hazardous Waste Site, located at 42-02 56th Road, Maspeth, Queens County, New York, ("the Site"). The Site is listed in the Registry of Inactive Hazardous Waste Disposal Sites in New York State (the "Registry") as Site Number 241002.

2. In this action, the State seeks to recover response costs that it has incurred as a result of Phelps Dodge Refining Company's contamination of the site, and defendants' failure to abide by the terms and conditions of their 2004 Order on Consent with the New York State

Department of Environmental Conservation ("DEC"), under which defendants committed to environmentally remediate their extensively contaminated site.  The State, through the New York State Department of Transportation ("DOT"), has had to and will incur millions of dollars in responding to the release or threatened release of hazardous substances and from the Site in connection with DOT's replacement of the Kosciuszko Bridge, a 1.1-mile elevated section of the Brooklyn-Queens Expressway (I-278) over Newtown Creek.  These costs include those incurred by the State when it assumed defendants' responsibility for capping the Site with an approved substance such as concrete, a task the defendants had agreed to but failed to perform in their 2004 Order on Consent.  The State has also incurred, and will continue to incur, costs conducting additional groundwater monitoring at the Site to ensure that hazardous substances present at the Site do not further migrate into the environment, including the adjacent Newtown Creek.

3.      This action is being brought parallel to a related condemnation proceeding between the parties in the New York State Court of Claims, which lacks jurisdiction over the environmental claims asserted herein.

## JURISDICTION AND VENUE

4.      This Court has exclusive jurisdiction over the First Claim for Relief, which arises under the laws of the United States, pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 42 U.S.C. §§ 9607 and 9613.  The Court has supplemental jurisdiction, under 28 U.S.C. § 1367, for the remaining claims for relief, which are based upon New York statutes and common law and arise out of a common nucleus of operative facts shared with the First Claim for Relief.  The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

5. Venue is proper in this district pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the releases of hazardous substances that gave rise to this action occurred in this district and the Site is located in this district.

## THE PARTIES

6. Plaintiff State of New York, as a body politic and a sovereign entity, brings this action on behalf of itself and as *parens patriae,* trustee, guardian, and representative on behalf of all residents and citizens of New York, particularly those individuals who live in the vicinity of the Site and Queens County, New York and Kings County, New York.

7. Defendant Freeport McMoRan Inc., d/b/a Phelps Dodge Refining Corporation ("Phelps Dodge") is a company organized under the laws of the State of New York and has a principal place of business at One North Central Avenue, Phoenix, Arizona.

8. Defendant PDRC Laurel Hill 9 LLC is a limited liability company organized under the laws of the State of New York and has a principal place of business at One North Central Avenue, Phoenix, Arizona. PDRC Laurel Hill 9 LLC is a wholly-owned subsidiary of Phelps Dodge.

9. Defendant Sagres Partners, LLC, ("Sagres Partners") is a company organized under the laws of the State of New York and a principal place of business at 2 Galasso Place, Maspeth, New York.

## STATUTORY AND REGULATORY BACKGROUND

10. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides that, when there is a release or threatened release of hazardous substances from a facility into the environment, the State may recover the costs that the State incurs to respond to the release or threatened release, including the costs of removal actions and remedial actions, from certain categories of persons

3

so long as the costs are "not inconsistent with the national contingency plan."

11. Section 107(a) of CERCLA sets out four classes of potentially responsible parties: (1) current owners and operators of a facility; (2) any party that owned or operated a facility at the time that hazardous substances were disposed of at that facility; (3) any party that arranged for the disposal, treatment, or transport for disposal or treatment of hazardous substances at the facility; and (4) any party that accepted hazardous substances for transport to the facility. 42 U.S.C. § 9607(a).

12. "Environment," "facility," "hazardous substance," "release," "removal," "remedial action," and "respond," are defined in Sections 101(8), (9), (14), (22), (23)-(25) of CERCLA, 42 U.S.C. §§ 9601(8), (9), (14), (22), (23)-(25).

13. New York's Environmental Conservation Law ("ECL") requires DEC to maintain a Registry of Inactive Hazardous Waste Disposal Sites ("the Registry") in New York State.

14. Pursuant to New York Real Property and Proceedings Law, Section 841, upon a "final judgment in favor of the plaintiff" in an action for nuisance, a court may "award [plaintiff] damages or direct the removal of the nuisance or both."

## FACTUAL ALLEGATIONS

15. The Site is located on the northern shore of Newtown Creek, in Queens County, at the base of and adjacent to the northern part of the Kosciuszko Bridge that carries the Brooklyn-Queens Expressway (I-278) over Newtown Creek.

16. The Site is divided into three parcels, two of which, parcels 1A and 2, with respective areas of 1.5 and 2.2 acres, are owned by Phelps Dodge, and one of which, parcel 9A, with an area of 1.9 acres, is owned by PDRC Laurel Hill 9 LLC.

17. Phelps Dodge owned the Site in its entirety from 1920 to 1986, and from 1997-2001. Upon information and belief, Phelps Dodge sold parcel 9A to Sagres Partners in 2001. Upon information and belief, Sagres Partners sold parcel 9A to PDRC Laurel Hill 9 LLC in August 2014.

18. From the late 19th century through to 1983, Phelps Dodge and its predecessors undertook numerous industrial activities the Site.

19. As early as 1888, G.H. Nichols & Company operated a copper smelting plant, phosphate works, and sulfuric acid plant at the Site.

20. In the early 1900s, the chemical operations at the site were taken over by Allied Chemical Company/General Chemical, which processed primarily lead and aluminum ore at the Site.

21. Phelps Dodge purchased Nichols Copper Company in the late 1920s and expanded operations and undertook a significant rebuilding program that was completed in 1936.

22. In or around 1928, Phelps Dodge constructed a copper sulfate plant at the Site. Phelps Dodge expanded their operations at the Site to produce tribasic copper sulfate and copper sulfate pentahydrate.

23. Phelps Dodge's operations at the Site also included the refining of silver and nickel.

24. Phelps Dodge used various toxic chemicals and metals in its operations at the Site. These materials included cadmium, lead, PCBs and asbestos, which have all been detected in various soil and groundwater samples at the Site.

25. Phelps Dodge discontinued smelting operations in approximately 1960 and the

associated buildings were razed in the early 1960s.

26. Manufacturing operations were discontinued in 1983 and Phelps Dodge removed equipment and cleaned out the buildings in 1984.

27. Pursuant to § 27-1305 of the ECL, DEC added the Site to the Registry in 1980 as a Class 2a Site. Class 2a is a temporary classification assigned to sites that have inadequate and/or insufficient data for inclusion in any of the other classifications. In December 1986, DEC reclassified the Site in the Registry from Class 2a to Class 2. Class 2 signifies that a significant threat to the public health and/or the environment exists and action is required.

28. In 1986, Phelps Dodge sold the Site to the United States Postal Service, which upon discovering the extreme extent of the contamination at the site, successfully sued to have the sale rescinded, and the Site reverted to the ownership of PDRC in 1997.

29. During 1986, a Remedial Action Plan was prepared to address removal of approximately 6,500 cubic yards of soils from the southeastern portion of the Site that had concentrations of cadmium and lead above the criteria being used by the DEC for classifying a hazardous waste.

30. Phelps Dodge decommissioned the Site between September 1999 and June 2000, razing all buildings and structures to ground level.

31. During site decommissioning, approximately 5,200 tons of PCBs contaminated waste, 3,400 tons of hazardous waste, 4,800 tons of asbestos containing material (ACM) and 8,500 tons of non-hazardous waste were disposed of off-site.

32. Between 1986 and 2000, Phelps Dodge conducted various investigations of environmental conditions at the Site, including a Remedial Investigation that was conducted pursuant to an order on consent with DEC.

33. Investigations of soil at the Site revealed the presence of metals, semi-volatile organic compounds (SVOCs) and PCBs above soil cleanup objective levels. Metals found in soil included arsenic, lead, copper, chromium and antimony. SVOCs found in soil at the Site included benzo(a)pyrene and benzo(a)anthracene, which are polycyclic aromatic hydrocarbons (PAHs).

34. Investigations of groundwater at the Site revealed the presence of metals above groundwater cleanup objective levels, including antimony, arsenic, cadmium, copper, iron, lead, magnesium, manganese, nickel, selenium, thallium and zinc.

35. Investigations of groundwater at the Site also revealed the presence of SVOCs above groundwater cleanup objective levels, including benzo(a)pyrene and benzo(a)anthracene. Investigations also showed the presence of Volatile Organic Compounds (VOCs) above groundwater cleanup objective levels, including benzene, 1,1,1-trichloroethane and 1,1-dicloroethane.

36. In a 2003 Record of Decision, DEC selected a plan for managing the hazardous substances that remained at the Site, which included capping the Site with a suitable material, such as concrete, to reduce the release and threatened release of hazardous substances at the Site into the environment.

37. The 2003 Record of Decision also required that groundwater treatment and monitoring would take place at the Site, and that a steel sheeting barrier would be installed adjacent to Newtown Creek to prevent the further migration of hazardous substances in groundwater to the waterway.

38. In a 2004 Order on Consent, defendants committed to implement and assumed responsibility for the cost of the Record of Decision's remedial plan, including the capping of

the Site and implementing groundwater treatment and monitoring, and they agreed to submit a plan by January 31, 2006 to perform the capping of the Site.

39. By January 31, 2006, Defendants had failed to submit the plan they had promised to submit by that date to perform the capping of the Site.

40. Between 2004 and 2012, DEC repeatedly reminded Defendants of their duties under the Order of Consent.

41. By 2012, despite their earlier commitment, Phelps Dodge and Sagres Partners had failed to fully implement the Site remedial plan; this failure extended to Phelps Dodge's and Sagres Partners' not having capped the Site.

42. Built in 1939, the Kosciuszko Bridge has been in operation for more than 75 years and has been subjected to significantly higher traffic volumes than it was designed to carry. Despite a series of interim repairs over the last twenty years, high use of the bridge has damaged the bridge substantially and the structural condition of the Kosciuszko Bridge is deteriorating.

43. In or about 2007, DOT determined that structural elements of the bridge exhibited severe deterioration and that the bridge required repair or full replacement. DOT subsequently decided to replace the deteriorating bridge by building a new elevated highway segment of the Brooklyn-Queens Expressway across Newtown Creek between Morgan Avenue in Brooklyn to the Long Island Expressway Interchange in Queens.

44. In 2012 and 2013, DOT obtained certain easements to the Site through eminent domain as part of its plan to replace the Kosciuszko Bridge in order to construct support structures for the new bridge on the Site, and for the storage of construction equipment and materials at the Site.

45. As a result of Phelps Dodge's and Sagres Partners' failure to comply with its

responsibilities under its 2004 Order on Consent to remediate and cap the Site, the State has begun the process of capping the Site itself in preparation for the bridge construction and has also constructed an augmented groundwater monitoring infrastructure to account for the contamination at the Site.  The State expects it will spend over four million dollars to cap the Site and upgrade the groundwater monitoring at the Site and otherwise complete the tasks defendants had committed to undertake themselves in the 2004 Order on Consent or were otherwise made necessary by their contamination, including, but not limited to, costs of investigation, remedial activity, and operation and maintenance, as those terms are defined or used in Sections 101(24), 101(25), 107(a) and 113 of CERCLA, 42 U.S.C. §§ 9601(24), 9601(25), 9607(a) and 9613.

46. The costs the State has incurred and will incur in the future are not inconsistent with the "National Contingency Plan," 40 C.F.R. Part 300.

### FIRST CLAIM FOR RELIEF - <u>CERCLA COST RECOVERY AGAINST PHELPS DODGE AND PDRC LAUREL HILL 9 LLC</u>

47. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 46 as if fully set forth herein.

48. The Site is a "facility" under CERCLA, 42 U.S.C. § 9601(9).

49. There have been "releases" or threatened "releases," as that term is defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), of "hazardous substances," as that term is defined in Section 101(4),  42 U.S.C. § 9601(14), from the Site and other facilities at the Site into the environment.

50. Among the chemicals that were and are threatened to be released into the environment from the Site are hazardous substances consistent with operations at the Site

9

during the time of Phelps Dodge's ownership of the Site that generated wastes that contaminated the environment, including soils and groundwater, within the meaning of CERCLA, 42 U.S.C. §§ 9601(8), 9601(14) and 9601(22).

51. The State has incurred costs, and will continue to incur costs, to "respond," as that term is defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), to the release and threatened release of hazardous substances at the Site, including costs to assess, monitor, evaluate, oversee and conduct response actions at the Site that constitute a "removal action" and/or a "remedial action," as those terms are defined in Sections 101(23) and (24) of CERCLA, 42 U.S.C. §§ 9601(23) and (24).

52. The State's response costs are not inconsistent with the National Contingency Plan, within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

53. Section 107(a) of CERCLA, § 9607(a)(4)(A), provides that persons who are current owners of a facility or were owners or operators at the time that hazardous materials were disposed "shall be liable for . . . all costs of removal or remedial action incurred by ... a State … not inconsistent with the national contingency plan."

54. Phelps Dodge and PDRC Laurel Hill 9 LLC are "persons" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

55. Phelps Dodge and PDRC Laurel Hill 9 LLC currently own the Site and are thus "owners" of a facility within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1).

56. Phelps Dodge owned the Site and when hazardous substances were disposed at the Site, and is thus an "owner" of a facility at the time of disposal within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

57. Phelps Dodge managed, directed or otherwise conducted operations at the Site, including operations specifically related to the acquisition, storage, use and disposal (including leakage) of hazardous substances, when hazardous substances were disposed at the Site and is thus an "operator" of the Site within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

58. Pursuant to CERCLA, 42 U.S.C. § 9607(a), Phelps Dodge and PDRC Laurel Hill 9 LLC are strictly, jointly and severally liable to the State for past costs incurred by the State in response to the release or threatened release at and from the Site.

59. Pursuant to CERCLA, 42 U.S.C. §§ 9607 and 9613, Phelps Dodge and PDRC Laurel Hill 9 LLC are strictly, jointly and severally liable for future response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site.

## SECOND CLAIM FOR RELIEF
## INDEMNIFICATION AGAINST ALL DEFENDANTS

60. The State hereby incorporates by reference the allegations contained in Paragraphs 1 through 59 as if fully set forth herein.

61. At times relevant hereto, defendants had and continue to have a duty and obligation to the public to investigate the scope of and abate the contamination described herein, and to alleviate the harm and risk of harm resulting from the contamination, including by capping the Site.

62. Defendants have failed to perform their duties and obligations in such circumstances.

63. Because of defendants' failure to perform their duties and obligations and their contamination of the Site, the State has had to and will have to investigate the scope of and

abate the contamination at and near the Site at the State's expense, including by capping relevant portions of the Site and constructing and performing upgraded groundwater treatment systems and monitoring.

64. In taking the action and incurring the expenses set forth herein, the State has performed and will perform duties and obligations owed by Defendants, under CERCLA, the ECL and/or contractually under the terms of the 2004 Order on Consent.

65. These actions taken and expenses incurred by the State are necessary to ensure the health, safety and well-being of the public and the environment.

66. Defendants have been and will be unjustly enriched by the State's performance of these duties and obligations owed by defendants.

67. The State is entitled to indemnification from defendants for the expenses the State is incurring in performing defendants' duties and obligations.

68. The State has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT AND RESTITUTION AGAINST ALL DEFENDANTS

69. The State hereby incorporates by reference the allegations contained in Paragraphs 1 through 68 as if fully set forth herein.

70. At times relevant hereto, defendants had and continue to have a duty and obligation to the public to investigate the scope of and abate the contamination described herein, and to alleviate the harm and risk of harm resulting from the contamination, including by capping the Site and performing groundwater monitoring.

71. Defendants have failed to perform their duties and obligations in such circumstances.

72. Because of defendants' failure to perform their duties and obligations and their

contamination of the Site, the State has had to and will have to investigate the scope of and abate the contamination at and near the Site at the State's expense, including by capping relevant portions of the Site and constructing and performing upgraded groundwater treatment systems and monitoring.

73. In taking the action and incurring the expenses set forth herein, the State has performed and will perform duties and obligations owed by defendants, under CERCLA, the ECL and/or contractually under the terms of Defendants' 2004 Order on Consent, and will therefore confer a benefit upon Defendants.

74. These actions taken and expenses incurred by the State are necessary to ensure the health, safety and well-being of the public and the environment.

75. Defendants have been and will be unjustly enriched by the State's performance of these duties and obligations owed by defendants.

76. The State is entitled to restitution from defendants for the expenses the State is incurring in performing defendants' duties and obligations.

77. The State has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
## PUBLIC NUISANCE AGAINST PHELPS DODGE

78. The State hereby incorporates by reference the allegations contained in Paragraphs 1 through 77 as if fully set forth herein.

79. The threatened release of hazardous substances from the Site and their presence in the environment, including groundwater, at and in the vicinity of the Site constitute a continuing public nuisance.

80. Phelps Dodge participated in the creation of this public nuisance at and in the vicinity of the Site.

81. The State incurred and will incur costs to abate the public nuisance at this Site.

82. Phelps Dodge is liable to the State under the common law of public nuisance and the New York Real Property and Proceedings Law, Section 841, for all costs, damages, and expenses arising from the State's abatement of this public nuisance.

## PRAYER FOR RELIEF

WHEREFORE, the State requests judgment in its favor and against defendants upon each claim and, further, requests that this Honorable Court enter judgment against defendants:

1. Awarding to the State a money judgment under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), against Phelps Dodge and PDRC Laurel Hill 9 LLC, jointly and severally, for all response costs incurred by the State, including interest, attorneys' fees and other costs of enforcement, in responding to the release or threat of release of hazardous substances at or from the Site, including the costs arising from and relating to the State's capping of the Site and constructing and performing groundwater systems and monitoring.

2. Declaring Phelps Dodge and PDRC Laurel Hill 9 LLC to be strictly, and jointly and severally, liable to the State under CERCLA for all future response costs and expenses, including interest, attorneys' fees and other costs of enforcement, to be incurred by the State in responding to the release or threat of release of hazardous substances at or from the Site, including in the costs arising from and relating to the State's capping of the Site and constructing and performing groundwater systems and monitoring.

3. Declaring defendants strictly, and jointly and severally, liable to the State for PDRC's unjust enrichment as a result of the State's actions; awarding the State restitution and indemnification for its costs incurred at the Site; and, declaring defendants to be strictly, and jointly and severally liable to the State for all future costs and expenses, including interest,

attorneys' fees and other costs of enforcement to be incurred by the State in responding to the release or threat of release of hazardous substances at or from the Site.

   4. Declaring Phelps Dodge strictly, and jointly and severally, liable to the State for the costs of abating the public nuisance at and about the Site; awarding the State restitution and indemnification of its costs incurred at the Site, and declaring Phelps Dodge to be strictly, and jointly and severally liable to the State for all future costs and expenses, including interest, attorneys' fees and other costs of enforcement to be incurred by the State in responding to the release or threat of release of hazardous substances at or from the Site, for abatement of the public nuisance.

   5. Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated: New York, New York
   March 2, 2016

          ERIC T. SCHNEIDERMAN
          Attorney General of the State of New York
          Attorney for Plaintiff


        By: /s/ John Turrettini
          John Turrettini
          Assistant Attorney General
          Environmental Protection Bureau
          120 Broadway
          New York, NY 10271
          (212) 416-8464